# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0230V**

CRYSTAL MURRAY,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: July 20, 2026

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mitchell Jones, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 7, 2021, Crystal Murray filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury, or in the alternative a caused-in-fact injury, after receiving a tetanus/diphtheria/acellular-pertussis ("Tdap") vaccine on May 7, 2019. Petition at 1, ¶¶ 1, 4.

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent disputes Petitioner has established pain onset timing consistent with the requirements of a Table SIRVA. For the reasons set forth below, I find that Table onset is likely met, and that she has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I. Finding of Fact Regarding Onset

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically pain) occurred within 48 hours, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(a) I.C. & II.C. (2017) (Table entries for tetanus and pertussis vaccines); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

### A. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B. Analysis

I make this finding after a complete review of the record, which includes all medical records, affidavits or declarations, and additional evidence filed. Specifically, I highlight the following:

- Prior to vaccination, Petitioner suffered numerous conditions, including headaches, gastrointestinal issues, heart palpitations, some anxiety and depression, and neck and back pain for which she sought chiropractic treatment. Ex. 2 at 45 (obstetrics and gynecology records); Ex. 4 at 13 (primary care provider ("PCP") records); Ex. 8 (chiropractic records).

- During an obstetrics appointment on May 7, 2019, Petitioner (then 38 years old, and eight months pregnant) received the Tdap vaccine intramuscularly in her left deltoid. Ex. 1 at 2 (vaccine record); *see* Ex. 9 at 11 (obstetrician's order for a Tdap vaccine); Ex. 10 at 1 (confirming receipt of the vaccine at a visit for prenatal care).

- One week later on May 14, 2019, Petitioner visited her PCP, complaining of achiness at the injection site which had *progressed and worsened* that morning. Ex. 7 at 82 (emphasis added). Reporting that she "started applying ice packs yesterday," she specified that she called her obstetrician's clinic that morning and was told to contact her PCP. *Id.* Employed as a nurse, Petitioner expressed concern about her lifting abilities. *Id.*

- Upon examination, the PCP observed "[f]ocal swelling and tenderness pf [the] lateral left shoulder without erythema[3]" and limitations in range of motion ("ROM"). Ex. 7 at 85. Opining that Petitioner was suffering adverse effects from her vaccination, the PCP prescribed oral steroids, wrote a note advising that Petitioner should not lift more than five pounds, and instructed her to return for follow-up care in three days. *Id.* at 86.

- When Petitioner returned on May 17, 2019, as instructed, she reported that "she can now lift her arm all the way up. . . . [and] was able to work last night." Ex. 7 at 87. In this record, it was noted that "[s]he got a TDaP on 5/7/19 and then her arm got sore, and she couldn't move her arm." *Id.* Noted to be 34 weeks pregnant (*id.*), Petitioner was instructed to return for further care "after she had the baby" (*id.* at 89).

- At her next obstetrics appointment on May 22, 2019, Petitioner "state[d] that her pain and numbness had improved for about 2 days after she was finished with the Rx[4]." Ex. 2 at 46. She added that, after four consecutive

[3] Erythema is "redness of the skin produced by congestion of the capillaries." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 643 (32th ed. 2012).

[4] Earlier in the medical record, Petitioner described the "Prednisone taper for 5 days" prescribed by her PCP." Ex. 2 at 45-46.

days of work, "the pain returned [but] she ha[d] not called for a f/u." *Id.* Petitioner also reported having some contractions that "ha[d] not increased in frequency or intensity." *Id.* Regarding the reoccurrence of her left shoulder symptoms, Petitioner was instructed to follow-up with her PCP. Ex. 2 at 46.

- Two days later (May 24, 2019), Petitioner attended a PCP acute visit, complaining of "pain and loss of motion in the left arm *after getting* [a] Tdap shot . . . on 5/7/19." Ex. 7 at 89 (emphasis added). She reported that her "[p]ain went away while on predisone [sic] [and] once completed the pain came back." *Id.* Repeating his earlier diagnosis of an adverse event following receipt of the tetanus vaccine, the PCP prescribed an additional 15 days of oral steroids. Ex. 7 at 90.

- On June 6, 2019, Petitioner gave birth to her son. Ex. 9 at 99-100.

- On July 2, 2019, Petitioner returned to her PCP for further treatment of her left shoulder pain and ROM loss since receiving the Tdap vaccine. Ex. 7 at 91. She stated that her "[s]ymptoms started *several days after* TDaP," but also reported "*normal* pain after the TDaP and then after about 4-5 days she started having *worse* pain." *Id.* (emphasis added).

- Regarding her ongoing symptoms, Petitioner described pain improvement and a return of "some ROM" with higher medication doses, but "issues" when taking the medication only once a day. Ex. 7 at 91. Petitioner added that her "symptoms ha[d] not changed at all, 'except not as bad since when it first started.'" *Id.*

- Observing decreased ROM and tenderness over the left lateral arm and biceps tendon insertion, the PCP diagnosed Petitioner with acute pain of the left shoulder, left arm weakness, myalgia, and tendinopathy of the left biceps tendon. Ex. 7 at 94.

- The next day (July 3, 2019), Petitioner visited the emergency room ("ER"), complaining of a "sudden onset of upper abdominal pain that radiate[d] straight through to her back 15 minutes prior to arrival . . . while . . . walking outside with family." Ex. 3 at 107. Noting that Petitioner had a baby boy three weeks ago, the ER physician diagnosed her with cholelithiasis[5]

[5] Cholelithiasis is the "presence or formation of gallstones." DORLAND'S at 349.

without cholecystitis[6] and prescribed medication that was not contraindicated when breast-feeding. Ex. 3 at 112.

- An MRI, performed on July 13, 2019, revealed no rotator cuff tear but some "[a]morphous edema with the lateral infraspinatus . . . [and] [s]uspected corresponding reactive subcortical edema involving the humeral head." Ex. 7 at 53. The radiologist opined that "[g]iven the reported immunization which may have been in relative proximity to this area, an infectious etiology is of consideration," but there was a lack of "significant superficial edema which would typically be seen in the setting of underlying infection." *Id.*

- At her initial physical therapy ("PT") evaluation on July 24, 2019, Petitioner "report[ed] [an] *insidious* onset of left shoulder pain since receiving the Tdap vaccine on 5/7/2019." Ex. 3 at 176 (emphasis added). Observing findings consistent with left shoulder impingement syndrome, the therapist recommended PT three times per week for six weeks. *Id.* 176-77.

- On July 26, 2019, Petitioner underwent a robot-assisted laparoscopic cholecystectomy[7] to treat her cholelithiasis. Ex. 3 at 169-70.

- The results of an EMG performed on August 13, 2019, were normal, except for an incidental finding of a Martin-Gruber Anastomosis.[8] Ex. 5 at 282-84.

- On August 20, 2019, Petitioner saw her PCP "for follow up on left shoulder pain and weakness, developed *several days* after getting [the] TDaP on 5/7/19." Ex. 7 at 96 (emphasis added).

- After reviewing Petitioner's recent testing, the PCP opined that, despite the lack of MRI evidence showing a high grade partial or full-thickness rotator cuff tear, the "edema-like signal involving the lateral infraspinatus" provided evidence of possible partial tearing. Ex. 7 at 96. He added diagnoses of a partial tear of the left rotator cuff and abnormal MRI, provided an orthopedic surgery referral, and instructed Petitioner to return in six months. *Id.* at 100-01.

[6] Cholecystitis is an "inflammation of the gallbladder." DORLAND'S at 348.

[7] A cholecystectomy is a "surgical incision of the gallbladder and colon." DORLAND'S at 348

[8] Anastomosis is "an opening created by surgical, traumatic, or pathological means between two normally separate spaces or organs." DORLAND'S at 75. "Martin-Gruber anastomosis is mainly recognized as a crossover from median nerve or its branches to ulnar nerve at the forearm, but may occur at the elbow." https://pubmed.ncbi.nlm.nih.gov/24492443/ (last visited July 17, 2026).

- On September 11, 2019, Petitioner visited an orthopedist for a second opinion of her left shoulder issues. Ex. 6 at 4. She stated that "she got a tetanus shot in her left shoulder and has been having ongoing pain *since*," and, aside from the tetanus vaccine, she could not relate her symptoms to "any other specific injury within her shoulder." *Id*. (emphasis added). Sharing that she "work[ed] as a float nurse . . . [and] currently ha[d] work restrictions," Petitioner described "pain . . . associated with specific movements." *Id.*

- On September 20, 2019, Petitioner attended her first PT session. Ex. 3 at 179. She again "state[d] that the origin of her pain was after she received a vaccine in her (L) shoulder." *Id.* Reporting pain when lifting her infant, sleeping, and working as a nurse, Petitioner was assessed as showing good motivation and rehabilitation potential. *Id.*

- At her second orthopedic visit on October 9, 2019, Petitioner again "report[ed] the pain started after she got a tetanus shot this past summer." Ex. 6 at 6. Characterizing the four PT sessions attended so far as unhelpful, she stated that "her shoulder [wa]s the same as during her visit a month ago." *Id.* Petitioner described pain "mostly at the anterior aspect and intermittently at the superior aspect of her shoulder." *Id.* It was noted that she "gave birth to a son approximately 4 months ago [and] currently work[ed] with restrictions as a float nurse." *Id.*

- After reviewing the July 2019 MRI, the orthopedist instructed Petitioner to continue attending PT and taking ibuprofen as needed, opining that he "still fe[lt] that this is something that ought to respond to conservative treatment." Ex. 6 at 8. However, he discussed "the possibility of a corticosteroid injection into the area of inflammation irritation" and surgery if Petitioner was "not making any improvements in 6 weeks." *Id.*

- At her next PT session on October, 14, 2019, Petitioner was noted to "ha[ve] bouts of bad migraines, which affect[ed] her pain and participation." Ex. 3 at 182.

- Petitioner was discharged from PT on November 14, 2019, after attending 13 sessions. Ex. 3 at 184. It was noted that she demonstrated increased shoulder flexibility and strength but "continue[d] to c/o ~2/10 pain in the left shoulder and difficulty with moving [her] arm laterally, lifting, and carrying activities." *Id.*

- At a third visit on November 20, 2019, the orthopedist characterized Petitioner's progress as slow, but good. Ex. 11 at 6. Petitioner expressed a greater ease but consistent pain "around the posterior aspect of her shoulder" when performing PT tasks. She reported being "unable to move 'adult-sized weights' since the pain began," – concerning because "she has a young infant at home to care for." *Id.*

- The orthopedist explained that "the weakness in [Petitioner's] shoulder when rotating outward [wa]s due to her rotator cuff still being torn [and] discussed the possibility of a steroid injection to alleviate inflammation in the area." Ex. 6 at 8. Due to the difficulty presented by the need to be in an arm sling for six weeks thereafter, it was decided that Petitioner would continue with her PT and follow-up in three months. Regarding her work, the orthopedist "recommended that she should keep things about the same as to not further aggravate and further injure her left shoulder." *Id.*

- Petitioner provided documentation showing correspondence between her unit coordinator, human resource representative, and herself from September 2019 through January 2020. Ex. 12. Petitioner provided information following her orthopedic visits, and a November 20, 2019 statement from her orthopedist, opining that Petitioner "may work with restrictions, [with] [n]o lifting greater than 10 pounds with her left upper extremity." *Id.* at 7.

- In correspondence dated January 22, 2020, the HR representative acknowledged receipt of Petitioner's documentation, dated December 19, 2019, "stating that [she] need[ed] to be off work indefinitely." Ex. 12 at 8. The HR representative noted Petitioner "ha[d] been continuously off work since 6/6/2019" and was asked on December 11, 2019, to provide medical documentation allowing for an assessment of her "continuing need for leave of absence, as well as whether [they] could provide any assistance to help [her] return to work." *Id.*

- On February 21, 2020, Petitioner visited her PCP "for established medical conditions, . . . [including] left shoulder pain after a Tdap shot several months ago." Ex. 7 at 101. Noting that an MRI "showed a partial tear of the tendon," the PCP discussed orthopedic and PT treatment, as well as the lack of a steroid injection and possible need for surgery. *Id.*

- At her next visit on March 4, 2020, the orthopedist assessed Petitioner as "making some slow, but good progress, . . . "good steps with her PT exercises." Ex. 11 at 10. Noting that Petitioner "was not currently working, he volunteered to write her a work note when she "[wa]s ready to work again." *Id.* The orthopedist opined that he "d[id] not necessarily think she could work and on restricted capacity at this time, but she is definitely getting closer." *Id.* at 11.

- In the record from Petitioner's next follow-up visit, Petitioner's PCP discussed her vaccine-related left deltoid injury, adding that "[i]t eventually got better." Ex. 7 at 104. Noting that she was a nurse at a local hospital but "ha[d] not worked for several months," Petitioner explained "[t]hey cut back due to the Covid 19 Pandemic." *Id.*

- In her signed declaration, Petitioner described her injury and treatment she received. Ex. 10 at ¶ 1. She discussed the difficulties she encountered working and caring for her son, and termination notice she received in January 2022. *Id.* at ¶¶ 1-4. Stating she was "eventually cleared to go back to work without restrictions [on] 4/15/20, but by then, [she] had no job to go back to," Petitioner claims to "still have some residual weakness and limitations in [her] left shoulder." *Id.* at ¶ 5.

The above medical entries show that, when seeking treatment, Petitioner consistently attributed her left shoulder pain to the Tdap vaccine she received on May 7, 2019.[9] Although she sometimes reported a slight onset delay – from a few to five days - a review of the entire record preponderantly supports the premise that Petitioner was referencing the *worsening* of her symptoms, as opposed to the literal onset date. At her July 2, 2019 PCP visit, Petitioner described left shoulder pain which began a few days after receiving the Tdap vaccine, but then recounted immediate *normal* pain which *worsened* four to five days later. Ex. 7 at 91. At her initial PT evaluation, Petitioner characterized her pain onset as *insidious.* Ex. 3 at 176. And she often utilized the term *since* when linking her pain to the Tdap vaccine. *See,* e.g., Ex. 6 at 4 (orthopedic record from September 2019 visit). In resolving onset disputes, such terminology is more often than not deemed to mean close-in-time to vaccination, not days later.

[9] While these entries were based upon information provided by Petitioner, they still should be afforded greater weight than more current representations, as they were uttered contemporaneously with Petitioner's injury for the purposes of obtaining medical care. The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528. Information provided by Petitioner to a treater and contained in a contemporaneous record deserves weight, and should not be considered subjective merely because it came from a patient, rather than physician.

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

## II. Additional Requirements for Entitlement

### A. Legal Standards

In addition to requirements concerning pain onset (discussed above in Section I), symptoms duration, and the lack of other award or settlement,[10] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F. R. § 100.3(a)(I)(C) & (II)(C). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

[10] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Analysis

Respondent has identified no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of a Tdap vaccine. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. *See* 42 C.F.R. § 100.3(c)(10)(i), (iv) (first and fourth QAI criteria). And Petitioner exhibited pain and limitations in ROM solely in her left, injured shoulder. *E.g.,* Ex. 7 at 82 (describing "achiness at the injection site"), 91 (reporting "[n]o numbness or pain anywhere else"); *see* 42 C.F.R. § 100.3(c)(10)(iii) (third QAI criterion).

As I have determined in this ruling, the record supports a finding that Petitioner suffered pain within 48 hours of vaccination. *See supra* Section I.B.; 42 C.F.R. § 100.3(c)(10)(ii) (second QAI criterion). Additionally, the medical records show Petitioner suffered the residual effects of her injury for more than six-months. At her PT discharge on November 14, 2019, Petitioner continued to experience pain at a severity of two out of ten, and she experienced "difficulty with moving [her] arm laterally [and] lifting and carrying activities. Ex. 3 at 184; *see* Section 11(c)(1)(D)(i) (six-month severity requirement). And the vaccine record shows Petitioner received the Tdap vaccine at her obstetrician's clinic in Michigan. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Furthermore, there is no evidence that Petitioner has collected a civil award for her injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## III. Appropriate Amount of Compensation

Although I have found Petitioner entitled to compensation, there are issues related to damages which may complicate the parties' efforts to informally resolve the remainder of this claim. Petitioner clearly experienced difficulties performing her duties as a float nurse, but the details surrounding her termination are not clear. There is evidence showing Petitioner was asked, but failed, to provide medical documentation in December 2019, so her restrictions could be accommodated. Ex. 12 at 8. However, Petitioner maintains she was shocked by her termination, and blames her employer for failing to make the needed accommodations, despite earlier promises to do so. Ex. 10 at ¶¶ 1-2.

Furthermore, events such as the birth of her son and the COVID-19 Pandemic may also have impacted her employment. In August 2020, Petitioner attributed her lack of work during the past few months to the COVID Pandemic. Ex. 7 at 104.

Thus, damages components like lost earnings are not in this case clearly attributable to the SIRVA. I will, however, allow the parties time to determine if an informal agreement related to compensation can be reached. Because they previously attempted to reach an informal settlement, I expect they will be able to quickly determine if an informal agreement can be reached. **Petitioner shall file a joint status report on behalf of the parties updating me on their damages discussions by no later than Friday, August 21, 2026.**

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master